UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
     v.                             )    Cr. No. 16-055 WES
                                    )
JORDAN MONROE,                      )
                                    )
          Defendant.                )
_____)
```

## OPINION AND ORDER

WILLIAM E. SMITH, Chief Judge.

Before the Court is Defendant Jordan Monroe's Motion To Suppress Statement (ECF No. 20), and the Government's Response in Opposition (ECF No. 23).[1] The Court conducted an evidentiary hearing on June 1, 2017, and heard argument the following day. After considering the evidence and arguments presented by the parties, for the reasons set forth herein, Defendant's motion is DENIED in part and GRANTED in part.

I. Background

The facts underlying this Motion are largely not in dispute. The Court gleans the following facts from the testimony at the evidentiary hearing and recordings of Monroe's police interviews.

---

[1] Def.'s Mot. to Suppress Statement ("Def. Mot."), ECF No. 20; Resp. to Def.'s Mot. to Suppress Statements ("Gov't. Resp."), ECF No. 23.

On May 12, 2016, at approximately 6:00 a.m., law enforcement arrived at Jordan Monroe's residence to execute a search warrant for evidence of child pornography-related crimes.[2] Monroe answered the door wearing a bathrobe after agents knocked and announced their presence.[3] About fifteen to twenty officers entered the home to execute the search warrant.[4] Special Agent James V. Richardson ("Special Agent Richardson") of Homeland Security Investigations, and Detective Adam Houston ("Detective Houston") of the Rhode Island State Police, brought Monroe to the home's finished basement.[5] Law enforcement began questioning Monroe at 6:24 a.m. in his home. Questioning continued at the State Police Barracks in Scituate, Rhode Island and ended sometime after 12:50 p.m.[6] Monroe complains of multiple <u>Miranda</u> and Due Process violations over the course of these interrogations.[7]

At the beginning of the first interview, which occurred at Monroe's home at 6:24 a.m., Special Agent Richardson told Monroe

---

[2] Hr'g Tr. 7:16-9:12, June 1, 2017.

[3] <u>Id.</u> at 9:13-10:10.

[4] <u>Id.</u> at 8:15.

[5] <u>Id.</u> at 10:14-17, 13:4-7.

[6] Exhibit A ("Interview at Home Tr."), ECF No. 23-1; Exhibit C ("Interview at Station Tr."), ECF No. 23-3; Hr'g Tr. 25:19-21, June 1, 2017; Hr'g Tr. 65:10-15, June 1, 2017.

[7] <u>See generally</u> Def. Mot.

that he was not under arrest, but that Special Agent Richardson was going to read Monroe his rights.[8] Special Agent Richardson did so, but Monroe refused to sign the form indicating he understood those rights.[9] Monroe, however, did acknowledge his understanding by stating, "I get it."[10] Just after this acknowledgement, Monroe, in hospitable fashion, expressed his regret that the officers had not called ahead, stating that if they had, he "woulda ordered pizza."[11] Monroe then admitted to downloading to his computer a large volume of child pornography from the internet.[12]

The interview continued and, after giving the officers a password to his server, Monroe stated, "I don't even have a [l]awyer, I don't know if I should be giving you passwords."[13]

Later in the same interview, after Detective Houston accused Monroe of being sexually attracted to children, Monroe stated, "Oh ok conversation's over."[14] Because Monroe and Detective Houston were speaking concurrently when Monroe said this, Special Agent

---

[8] Interview at Home Tr. 1.

[9] Id.; Exhibit B. ("Miranda Form 1"), ECF No. 23-2.

[10] Interview at Home Tr. 1-2.

[11] Id. at 2.

[12] Id. at 4.

[13] Id. at 6-7.

[14] Id. at 18.

Richardson testified that he did not hear Monroe say, "conversation's over."[15]

The interview continued until 6:59 a.m.[16] At this time, Special Agent Richardson told Monroe, "let's end the interview for now . . . I'll go speak to somebody and uh maybe they're gonna let you go outside right there and smoke a butt."[17] A short time later, Defendant was permitted to smoke in his side yard and patio area.[18]

Law enforcement recommended questioning at Monroe's home at 7:34 a.m., and Monroe was not re-informed of his <u>Miranda</u> rights.[19] During this interview, Monroe consented to taking a polygraph test about the information he had provided.[20] The interview at Monroe's home concluded at 8:01 a.m.[21] Monroe was then formally arrested and taken to the State Police Scituate Barracks.[22]

---

[15] Audio Recording at 22:45, Jordan Monroe RISP-HIS Statement, Ex. F ("Audio of In Home Interview"), ECF No. 23-6 (on file with Court); Hr'g Tr. 15:11-13, June 1, 2017.

[16] Interview at Home Tr. 28.

[17] <u>Id.</u>

[18] Hr'g Tr. 16:5-8, June 1, 2017.

[19] Interview at Home Tr. 28.

[20] <u>Id.</u> at 45.

[21] <u>Id.</u> at 47.

[22] Hr'g Tr. 17:18-18:11, 53:12-14, June 1, 2017.

After arriving at the Barracks, Special Agent Christopher Braga ("Special Agent Braga") of the FBI, and Special Agent Richardson, conducted a so-called "pre-polygraph" interview with Monroe, beginning at approximately 9:27 a.m.[23] Within minutes, Monroe stated, "I'm nervous now, because that other State Police Detective was a douche bag to me, so, now I'm thinking, maybe lawyer."[24]

Shortly after this interaction, Special Agent Braga began to create a narrative for the interview that reassured Monroe that his job was simply to determine whether Monroe was a "predator" or "monster," while reassuring Monroe that what Monroe did was "not the end of the world."[25]

Special Agent Braga then read Monroe his <u>Miranda</u> rights at approximately 9:50 a.m.[26] Monroe did not sign the <u>Miranda</u> acknowledgement form but when asked if he understood the rights, he answered in the affirmative.[27] Shortly thereafter, Monroe stated, "Because even if I ask for a lawyer at this point that could [be] next fucking week before somebody showed up, who

---

[23] <u>Id.</u> at 54:5-10, 55:14-20.

[24] Interview at Station Tr. 2:45-46.

[25] <u>Id.</u> at 4:90-94, 4:100.

[26] <u>Id.</u> at 13:379-87.

[27] Exhibit D ("Miranda Form 2"), ECF No. 23-4; Interview at Station Tr. 14:395-96.

knows?"[28] Special Agent Braga responded to this statement by saying, "Well, I mean, it's your, it's your right, but this makes it uhh, this makes [it] quicker."[29] To this, Monroe replied, "It's my right to not have Mexican[s] take seven dollar an hour jobs," and, moments later stated, "I'll just vote for Donald, he'll build a wall."[30]

After the pre-polygraph interview proceeded for a while, Monroe stated: "I'm still thinking in the back of my mind, lawyer, lawyer, these guys are going to fuck you."[31] Questioning again continued.[32] Later in the interview, at approximately 11:25 a.m., Monroe said: "[H]ave you ever heard of the term, hypoglycemia? . . . I haven't eaten all day."[33] Special Agent Braga and Special

---

[28] Interview at Station Tr. 14:398-399.

[29] Id. at 14:400-01.

[30] Id. at 14:402-03, 14:407.

[31] Id. at 34:999-1000.

[32] Id. at 34.

[33] Id. at 101:3052-53, 101:3055. Monroe avers that, "[o]nly at that point, two hours into this third interrogation, after being denied his right to an attorney, and after being denied food and water, did Monroe admit that he had had sex with his step-daughter." (Def. Mot. 9.) The Government refutes the notion that Monroe was deprived of essential needs. (Gov't Resp. 36.) This issue is not discussed herein as Defendant does not develop the argument, and, in any event, waiting thirty-five minutes does not qualify as a "bald disregard of . . . [a] rudimentary need for food." See Culombe v. Connecticut, 367 U.S. 568, 622 (1961)(citing Payne v. Arkansas, 356 U.S. 560 (1958)) (finding waiting twenty-

Agent Richardson told Monroe they would get him food before the polygraph and after they finished the current interview.[34] Shortly after this interaction, Monroe admitted to having sex with his step-daughter when she was fifteen years old.[35] Monroe received food between fifteen and thirty-five minutes after requesting it, and the interview concluded at approximately 12:15 p.m.[36]

Monroe then submitted to an unrecorded polygraph examination, followed by a recorded post-polygraph examination.[37] The Government does not seek to admit any of Monroe's statements during the post-polygraph interview in its case in chief, but contends that such statements may be used if Monroe chooses to testify at trial.[38] Defendant seeks to exclude all of the post-polygraph statements, regardless of their use.

---

five hours before receiving any food to be a factor in finding defendant's confession coerced).

[34] Interview at Station Tr. 102:3057-62.

[35] Id. at 103:3101-3103, 104:3125-3129, 104:3144-105:3147.

[36] Hr'g Tr. 31:7-8, June 2, 2017; Interview at Station Tr. 100:2995, 101:3052, 113:3389-114:3417. Regarding the approximate end time of the pre-polygraph interview, note that the interview began around 9:27 a.m., the timestamp on the transcript runs from this time until roughly two hours and fifty-seven minutes later, when the interview ends. Hr'g Tr. 55:14-16, June 1, 2017; see also Interview at Station Tr. 1:2, 115:3443.

[37] Hr'g Tr. 64:9-12, June 1, 2017; Interview at Station Tr. 116.

[38] Gov't Resp. 39-40; Hr'g Tr. 24:19-21, June 1, 2017.

During the post-polygraph interview, Special Agent Braga told Monroe that he failed the polygraph examination "in regards to additional sexual contact . . . with minors[,]" and if he did not tell the truth, "people are going to draw their own conclusions."[39] Special Agent Braga also told Monroe that if he was not a "predator" Monroe should tell the agents what he was keeping from them and they would not get mad at him.[40] Monroe stated, "Lawyer."[41] Special Agent Braga responded by stating, "Right, you can have a lawyer anytime you want. We, we advised you of that," and continued the questioning.[42]

Shortly after this interaction, Monroe then stated, "[L]awyer, this, this is done."[43] Nonetheless, Special Agent Braga again continued the questioning.[44] At the evidentiary hearing on this motion, Special Agent Richardson conceded that he should have stepped in at this point, stopped the interview, and clarified whether Monroe wanted to continue.[45]

---

[39] Interview at Station Tr. 117:3476-77, 123:3682-83.

[40] Id. at 127:3823-31.

[41] Id. at 128:3837.

[42] Id. at 128:3838-39.

[43] Id. at 129:3863.

[44] Id. at 129.

[45] Hr'g Tr. 97:17-19, June 1, 2017.

Defendant alleges additional violations of his <u>Miranda</u> rights after this point in the interrogation.[46] The Court need not address these violations as the Court suppresses all statements after this point, as discussed further below.

## II. Discussion

### A. The Interrogation at Monroe's Home

#### 1. Whether the Interrogation at Monroe's Home Was Custodial

Monroe argues that the interrogation at his home was custodial because he was separated from his family and he was not free to leave.[47] Specifically, Monroe argues that when he was permitted to go outside to smoke a cigarette and Special Agent Richardson said, "maybe they're gonna let you go outside . . . and smoke a butt," a reasonable person in Monroe's situation would not have believed he was in fact free to leave.[48] The Government counters that the control exercised over Monroe in this interaction was "a simple officer safety situation" and that officers "have every right to control that environment and to control for their own safety who is in the house and where they are and where they're going and what they're doing" during a search.[49] Additionally, according to

---

[46] Def. Mot. 16.

[47] Hr'g Tr. 35:23-36:7, 40:22-41:1, June 2, 2017.

[48] <u>Id.</u> at 39:14-22; Interview at Home Tr. 28.

[49] Hr'g Tr. 12:6-10, June 2, 2017.

the Government, the interrogation at Monroe's home was not custodial because they were in his home, Monroe was not handcuffed or restrained, and Monroe had been advised that he was not under arrest.[50]

Law enforcement need only respect <u>Miranda</u> rights during custodial interrogations.[51] "The determination [of whether an interrogation is custodial] involves two distinct inquiries: 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'"[52] While the Court must examine the totality of the circumstances to determine custody for <u>Miranda</u> purposes,

> [the First Circuit has] identified several factors that guide the analysis. Those factors include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation."[53]

---

[50] Gov't. Resp. 13; Interview at Home Tr. 1.

[51] <u>United States v. Infante</u>, 701 F.3d 386, 398 (1st Cir. 2012).

[52] <u>Id.</u> at 396 (quoting <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995)).

[53] <u>Id.</u> (quoting <u>United States v. Hughes</u>, 640 F.3d 428, 435 (1st Cir. 2011)).

The original interrogation of Monroe occurred at his home, he was not handcuffed, and the questioning lasted approximately an hour and a half; it began at 6:24 a.m. and ended at 8:01 a.m. with a roughly thirty-minute break midway, which qualifies as a relatively short interview.[54] These facts weigh in favor of finding the interview non-custodial.[55] Conversely, while only Special Agent Richardson and Detective Houston conducted the questioning, fifteen to twenty officers were present at the scene.[56] Additionally, the questioning occurred shortly after 6:00 a.m., Monroe, having been wrested from sleep, was dressed in his bathrobe, and the officers, at times, appeared to threaten and intimidate Monroe.[57] For example, Detective Houston noted at one point that he could make the search inconvenient for Monroe's family, and later accused Monroe of being sexually attracted to

---

[54] Interview at Home Tr. 1, 28, 47. Precedent suggests that a one-hour interview is relatively short. See Hughes, 640 F.3d at 437 (citing Beckwith v. United States, 425 U.S. 341, 342-43, 347-48 (1976)) (noting that an in-home, three-hour interview did not necessitate Miranda protection).

[55] See Hughes, 640 F.3d at 435-37 (finding that a lack of "meaningful physical restraint" over the suspect, that the suspect was interrogated in his own home, and that the interrogation was ninety minutes, to be factors weighing in favor of finding the interview non-custodial).

[56] See United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007) (finding eight officers in home as supportive of finding interrogation custodial).

[57] Interview at Home 1.; Hr'g Tr. 10:9-10, June 1, 2017; Def. Mot. 4 n.2.

children.[58] These facts weigh in favor of finding the interview custodial.[59]

Of particular note, when Monroe asked to smoke a cigarette, Special Agent Richardson stated, "I'll go upstairs and speak to somebody and uh maybe they're gonna let you go outside right there and smoke a butt."[60] The statement informs the question of whether a reasonable person would believe he or she were free to leave. As the First Circuit stated in an analogous case:

> The government argues that the physical control was necessary to preserve potential evidence within the house and protect the safety of the officers. While that may be so, this justification does not answer the very different question of whether a reasonable person . . . would believe he was not at liberty to terminate the interrogation and leave.[61]

The fact that Monroe had to obtain permission to smoke on his own patio, even if this control was solely for officer safety purposes, when combined with having fifteen to twenty officers in his home, at 6:00 a.m., while still in his bathrobe, and after being separated from his family,[62] tips the scales in favor of

---

[58] Interview at Home Tr. 8, 18.

[59] Cf. Hughes, 640 F.3d at 436 (finding interview "relaxed and non-confrontational" where the interview was conducted in the late afternoon, the officers remained calm and polite, and the defendant was dressed appropriately for the interview).

[60] Interview at Home Tr. 28.

[61] Mittel-Carey, 493 F.3d at 40.

[62] Compare United States v. Rang, No. 1:15-cr-10037-IT-1, 2017 U.S. Dist. LEXIS 2184, at *6 (D. Mass. Jan. 6, 2017) (noting

concluding that this was a custodial interrogation. A reasonable individual would not believe he or she was free to terminate the interrogation and leave. Accordingly, the Court finds that the interrogation at Monroe's home was custodial, and Miranda applies.

### 2. Whether Monroe Waived His Miranda Rights

In order for Monroe's statements to be admissible, the Government must prove Monroe waived his Miranda rights by a preponderance of the evidence and the waiver must be made "voluntarily, knowingly and intelligently."[63] During the first set of questions, Monroe was read his rights and stated, "I get it."[64] While Defendant argues that he was distracted when his rights were read,[65] there is no evidence of any distraction. Additionally, Defendant argues that he did not understand his rights because later at the police station, after being informed of his rights, he remarked it would take a week for an attorney to get there.[66] The Government, however, notes that Monroe, later in the day,

---

defendant's isolation from family during questioning as factor weighing in favor of finding interrogation custodial); with United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991)(finding presence of defendant's family nearby as evidence of non-custodial questioning).

[63] Colorado v. Connelly, 479 U.S. 157, 175 (1986); Miranda v. Arizona, 384 U.S. 436, 444 (1966).

[64] Interview at Home Tr. 1.

[65] Def. Mot. 3.

[66] Hr'g Tr. 41:21–42:5, June 2, 2017.

stated he was done and wanted a lawyer, suggesting he understood his rights perfectly well.[67] Monroe is an adult, and there is no evidence suggesting he has an intellectual disability or is of diminished capacity. When he stated, "I get it," officers were entitled to accept his statement. And, as discussed below, Monroe's statements and comments later in the day reveal he did, in fact, get it. The Court therefore finds that Monroe understood his <u>Miranda</u> rights at his home and made a knowing and voluntary waiver of them.

3. Whether Monroe Unequivocally Invoked His Right to Counsel at His Home

Monroe argues that he clearly and unambiguously invoked his right to counsel in the first interview when he stated: "I don't even have a lawyer, I don't know if I should be giving you passwords."[68] The Government argues that Monroe's statement was not an unequivocal invocation of the right to counsel.[69]

Once a suspect waives the right to counsel, until the suspect makes an "unequivocal" request for counsel, officers may continue questioning the suspect.[70] "[A] statement either is such an

---

[67] <u>Id.</u> at 29:18-30:3.

[68] Def. Mot. 3; Interview at Home Tr. 7.

[69] Gov't Resp. 17-18.

[70] <u>Davis v. United States</u>, 512 U.S. 452, 462 (1994).

asserion of the right to counsel or it is not."[71]  In determining whether an unequivocal statement was made, the inquiry is objective: the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[72] If the suspect does invoke, the interrogation must cease.[73]

In the instant case, Monroe stated, "I, I don't even have a lawyer, I don't know if I should be giving you passwords."[74] Similar statements have not been held to be clear invocations of the right to counsel.[75] As such, the statement was equivocal and a reasonable police officer would not have understood the statement as a clear invocation of the right.  Accordingly, Monroe's alleged <u>Miranda</u> violation claim fails in regards to the statement: "I don't even have a lawyer."

---

[71] <u>Id.</u> at 459 (quoting <u>Smith v. Illinois</u>, 469 U.S. 91, 97-98 (1984) (per curium)).

[72] <u>Id.</u>

[73] <u>Id.</u> at 461.

[74] Def. Mot. 3.

[75] <u>See</u> <u>Davis</u> 512 U.S. at 462 (holding "[m]aybe I should talk to a lawyer" insufficient to trigger <u>Miranda</u>); <u>see also</u> <u>United States v. Dudley</u>, 804 F.3d 506, 514 (1st Cir. 2015)(concluding defendant telling wife to call someone to get a lawyer is not unequivocal).

4. Whether Monroe Invoked His Right to Remain Silent at His Home

Monroe next argues that he invoked his right to remain silent when he stated, "Oh ok conversation's over," in response to Detective Houston accusing him of being sexually attracted to children.[76] The Government argues that Monroe's statement was not an unequivocal invocation of the right to remain silent because Detective Houston and Monroe were speaking over one another and neither Detective Houston nor Special Agent Richardson heard the statement.[77] Additionally, according to the Government, Monroe, "without pause," answered Detective Houston's question following his statement, and the statement was more indicative of a reactionary response to Monroe being accused of being a child molester than it was an invocation of the right to counsel.[78]

The same standard applies for invoking the right to remain silent as for invoking the right to counsel; invocation of the right must be "unambiguous" and the inquiry into whether the right was invoked is objective.[79] Again, the question becomes whether "a

---

[76] Def. Mot. 16; Interview at Home Tr. 18.

[77] Gov't Resp. 19-20.

[78] Id.

[79] Berghuis v. Thompkins, 560 U.S. 370, 381 (2010) (noting that "there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel").

reasonable police officer in the circumstances would understand the statement to be [a <u>Miranda</u> invocation]."[80] In this regard, "[i]f no officer heard [an alleged invocation], it could not have been a clear invocation [of the right] . . . [because] officers could not have objectively understood a statement they did not hear."[81] Further, if "the accused himself initiates further communication, exchanges, or conversations with the police," questioning can continue even after a previous invocation.[82]

Monroe's statement, in context, is a close call. Monroe did state, "Oh ok conversation's over." Nevertheless, the audio recording makes clear that Detective Houston was speaking at the same time as Monroe. At almost exactly the second syllable of the word "con<u>ver</u>sation," Detective Houston asked a follow-up question, to which Monroe immediately responded.[83]

---

[80] <u>Davis</u>, 512 U.S. at 459.

[81] <u>Dudley</u>, 804 F.3d at 513.

[82] <u>United States v. Thongsophaporn</u>, 503 F.3d 51, 55-56 (1st Cir. 2007) (quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 485 (1981))(internal quotation marks omitted).

[83] Audio of In Home Interview 22:45. A transcript of this portion of the questioning at Monroe's home is reproduced below:

| Houston: | So, so we've been doing this a long time, alright. You know what I think the reason why you're doing it is because just bluntly you're afraid to say that you're sexually attracted to children. |
|---|---|

First, given that Detective Houston and Monroe spoke concurrently, and in light of Special Agent Richardson's testimony that he did not hear the statement, the Court concludes that the officers did not hear the statement.[84] This alone is adequate to find that Monroe's statement did not require the officers to stop the questioning because the "officers could not have objectively understood a statement they did not hear."[85]

---

| Monroe: | Oh ok con. . . |
| Monroe \| Houston concurrently: | . . .versation's over. \| I'm right aren't I? |
| Monroe: | No I'm not, I'm not [-] there's not one child in this neighborhood that I want anything to do with. |

[84] The value of the audio recording to this holding cannot be overstated. Without the recording it would be difficult to conclude that both Detective Houston and Special Agent Richardson did not hear Monroe's statement. But listening to the audio makes that contention not only plausible but probable. Moreover, situations like this not only show the value of recording – a topic on which this court has expressed strong views in the past, see United States v. Mason, 497 F. Supp. 2d 328, 335-36 (D.R.I. 2007) – but also suggests that in an era where recording is becoming ubiquitous, see Alan M. Gershel, A Review of the Law in Jurisdictions Requiring Electronic Recording of Custodial Interrogations, 16 Rich. J.L. & Tech. 9 (2010), the case law holding that law enforcement officers need not follow up to clarify whether a suspect intends to invoke his rights, see Davis, 512 U.S. at 461, might be due for reconsideration.

[85] Dudley, 804 F.3d at 513.

18

Second, because Monroe continued to speak immediately after stating "conversation's over," Monroe initiated "further communication . . . with the police."[86] Therefore, even if Special Agent Richardson and Detective Houston did hear Monroe's statement, the officers still would not have needed to end the questioning. If a suspect chooses to speak, officers cannot be expected to cover their ears. Accordingly, there was no <u>Miranda</u> violation during the interview at Monroe's home.

B. The Questioning at the Police Station[87]

    1. Whether Monroe's <u>Miranda</u> Rights Were Violated During the Pre-Polygraph Interview

Monroe argues that his right to counsel was violated because he unambiguously invoked his right to counsel three times during the pre-polygraph interview and, after each invocation, officers continued to question him.[88]

Defendant argues that he invoked first when he stated, "[N]ow I'm thinking, maybe lawyer",[89] and second, when after being read

---

[86] <u>Thongsophaporn</u>, 503 F.3d at 55-56 (quoting <u>Edwards</u>, 451 U.S. at 485) (internal quotation marks omitted).

[87] The Court concludes that Monroe fully understood his <u>Miranda</u> rights during questioning at the State Police Barracks. After being asked if he understood his rights, Monroe answered affirmatively. (Interview at Station Tr. 14:394-96.) The argument that Monroe did not understand his rights is unavailing.

[88] Def. Mot. 18.

[89] <u>Id.</u> at 18; Interview at Station Tr. 2:46.

his <u>Miranda</u> rights, he stated, "Because even if I ask for a lawyer at this point, that could [be] next fucking week before somebody showed up."[90] Regarding this later invocation, Monroe further argues that Special Agent Braga's response, "Well, I mean, it's your, it's your right, but, this makes it uhh, this makes [it] quicker," is evidence that the officers believed Monroe was invoking, that Special Agent Braga tried to dissuade him, and that Special Agent Braga misrepresented the right.[91] Finally, Monroe argues that he also invoked his right to counsel when he stated, "I'm still thinking in the back of my mind, lawyer, lawyer, these guys are going to fuck you."[92] The Government, naturally, argues that none of these statements are clear, unequivocal requests for counsel, and as such, continued questioning was permissible.[93]

As stated above, an invocation of the right to counsel must be "unequivocal," otherwise officers may continue questioning a suspect.[94] Simply put, "a statement either is such an assertion of the right to counsel or it is not."[95]

---

[90] Interview at Station Tr. 14:398-99.

[91] <u>Id.</u> at 14:400-01; Def. Mot. 18-19.

[92] Def. Mot. 18; Interview at Station Tr. 34:999-1001.

[93] Gov't Resp. 28-36.

[94] <u>See</u> <u>Davis</u>, 512 U.S. at 459.

[95] <u>Id.</u> at 459 (quoting <u>Smith</u>, 469 U.S. at 97-98 (per curium)) (internal quotation marks omitted).

Monroe's three statements, "now I'm thinking, maybe lawyer"; "even if I ask for a lawyer at this point, that could [be] next fucking week before somebody showed up"; and "I'm still thinking in the back of my mind, lawyer, lawyer," are all equivocal.[96] The statements are simply not unequivocal assertions of the right to counsel. As to the argument that Special Agent Braga's response to the second statement, arguably steering Monroe away from invoking, demonstrates that Special Agent Braga thought Monroe was asserting his right, this argument is unpersuasive. The test is "objective," and does not hinge on Special Agent Braga's subjective view.[97] No objective officer would view that statement as an unequivocal invocation.

Monroe's argument that Special Agent Braga misrepresented Monroe's rights and dissuaded him from invoking also falls flat. He contends that Special Agent Braga's statement "encourage[ed] his misconception," but as discussed above, the Court concludes that Monroe did not misunderstand his rights.[98] Additionally, Special Agent Braga's statement was not untrue; undoubtedly Special Agent Braga's task of gathering evidence against Monroe

---

[96] See Davis, 512 U.S. at 462 (finding "[m]aybe I should talk to a lawyer" insufficient to trigger Miranda); see also Dudley, 804 F.3d at 514 (finding defendant telling wife to call an individual to get a lawyer insufficient to trigger Miranda).

[97] Davis, 512 U.S. at 459.

[98] Hr'g Tr. 50:3-4, June 2, 2017.

was quickened by Monroe foregoing an attorney during questioning; and Special Agent Braga's statement was a reasonable reaction to Monroe's equivocal statement – it left the door open for Monroe either to invoke his right unequivocally or to continue talking.

With respect to Special Agent Braga's purported dissuasion, more than the comment, "[proceeding without an attorney] makes it . . . quicker," is needed to constitute a <u>Miranda</u> violation.[99] Accordingly, the Court finds that Monroe's <u>Miranda</u> rights were not violated during the pre-polygraph questioning and, accordingly, no statements from this interview need be suppressed.

### 2. Whether Monroe's <u>Miranda</u> Rights Were Violated During the Post-Polygraph Interview

Monroe argues that he invoked his right to counsel and his right to remain silent several times in the post-polygraph interview.[100] The first invocation Monroe alleges is when he stated, "Lawyer."[101] Special Agent Braga's response to this statement was, "Right, you can have a lawyer anytime you want. We, we advised you

---

[99] <u>See</u> <u>Kyger v. Carlton</u>, 146 F.3d 374, 379 (6th Cir. 1998) (concluding that police statement, "Now, if you've got something to hide, I can understand you not wanting to sign that, [but] [i]f you ain't got nothing to hide, you know, you can answer our questions," would "render . . . questioning constitutionally infirm") (internal quotation marks omitted).

[100] Def. Mot. 18-19.

[101] <u>Id.</u> at 19; Interview at Station Tr. 128:3837.

of that. But, understand this . . . ."[102] To which Monroe replied,

"No, no."[103] A short time later, Monroe stated, "[L]awyer, this,

this is done."[104] Special Agent Braga, however, continued the

questioning once more.[105] Monroe further alleges that he invoked

his rights at several other points during this questioning. The

Government, in rejoinder, says it does not seek to admit any

statements from the post-polygraph statement, but wishes to

reserve the right to use the statements on cross-examination or

rebuttal.[106]

The framework here is once again clear: invocation of the

right to counsel must be "unequivocal," and if invocation occurs,

questioning must cease.[107] Nevertheless, "[o]ne exception to the

[exclusionary] rule permits prosecutors to introduce illegally

obtained evidence for the limited purpose of impeaching the

credibility of the defendant's own testimony."[108] It is well

established that:

---

[102] Interview at Station Tr. 128:3838-3839.

[103] Id. at 128:3840.

[104] Id. at 129:3863.

[105] Id. at 129:3866.

[106] Gov't Resp. 2 n.1, 39-40.

[107] Davis, 512 U.S. at 462.

[108] James v. Illinois, 493 U.S. 307, 312 (1990).

a defendant "must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility."[109]

Monroe's statement, "Lawyer," is an unequivocal invocation of the right to counsel, and questioning should have ceased immediately. That Special Agent Braga continued the interview was a blatant disregard of Monroe's right to an attorney. "[L]awyer, this, this is done," was also a clear, unequivocal invocation. There is, in fact, not much issue with this second statement: Special Agent Richardson, at the hearing on this motion conceded, "[a]t that one point I should have at least stopped the interview and clarified with him what he wanted to do."[110]

This aside, statements made after these invocations are suppressed and may be admissible only to the extent they are used to impeach Defendant and are otherwise admissible under the Federal Rules of Evidence.[111]

---

[109] Id. (quoting Walder v. United States, 347 U.S. 62, 65 (1954)).

[110] Hr'g Tr. 97:17-19, June 1, 2017.

[111] The Court notes that this holding could result in the Court suppressing other evidence, if that evidence was obtained based on the suppressed statement and does not fall within an exception to the Exclusionary Rule.

C. Whether Monroe's Due Process Rights Were Violated

Monroe argues that his statements were involuntary because they were obtained using the "Reid Technique;" officers used threats and promises to gain his cooperation; and the officers did not stop the questioning when Monroe invoked his <u>Miranda</u> rights.[112] Monroe argues that "[e]ach of these factors, separate and cumulatively, combined to elicit involuntary statements."[113] The Government argues that the interview at Monroe's home was voluntary because Monroe was relaxed and loquacious and at times even directed the conversation, for example, discussing the HBO television program The Wire.[114] The Government also contends that

---

[112] Def. Mot. 19-23.

[113] <u>Id.</u> at 23.

[114] Gov't Resp. 24. "Fuckin great, great show and I like when it came on HBO . . . I missed season five . . . I've got to see the whole thing." (Interview at Home Tr. 46.) It does indeed appear that Monroe missed Season Five. In that year's Season Premier, in January 2008, a suspect is tricked into inculpating himself when the officers convince the suspect that a photo-copy machine can detect if he is lying. <u>The Wire: More with Less</u> (Blown Deadline Productions and Home Box Office television broadcast Jan. 6, 2008). Had Monroe not missed this episode, perhaps he would have recognized the trickery afoot in his own situation, as the agents used the polygraph to facilitate Monroe's self-incrimination. Such trickery and deception has long been a tool of law enforcement, endorsed by the courts. <u>See</u> <u>Frazier v. Cupp</u>, 394 U.S. 731, 738-39 (1969) (finding that falsely telling suspect in interrogation that co-defendant confessed did not make suspect's confession inadmissible); <u>see also</u> <u>Holland v. McGinnis</u>, 963 F.2d 1044 (7th Cir. 1992) (finding that falsely telling suspect during interrogation that a police report contained information from a witness that incriminated the suspect did not, alone, render the confession involuntary). But, as discussed below, there are limits

Monroe was similarly relaxed at the beginning of the pre-polygraph interview and that Monroe's choice not to sign the <u>Miranda</u> waiver forms both at his home and at the station is demonstrative of a voluntary choice.[115] Finally, the Government argues that the Reid Technique does not violate Due Process and there is no evidence that the technique was even used.[116]

The Fifth Amendment bars the admission of involuntary confessions.[117] To determine whether statements are made involuntarily, "courts must inquire 'whether the will of the defendant had been overborne so that the statement was not his free and voluntary act.'"[118] In making this inquiry, the Court considers the totality of the circumstances.[119] Relevant factors include: "the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's

---

and boundaries to these tactics that law enforcement agents must respect and not cross.

[115] Gov't Resp. 20, 27-28.

[116] <u>Id.</u> at 38; Hr'g Tr. 32:4-8, June 2, 2017.

[117] <u>United States v. Jacques</u>, 744 F.3d 804, 809 (1st Cir. 2014).

[118] <u>Id.</u> (quoting <u>Bryant v. Vose</u>, 785 F.2d 364, 367-68 (1st Cir. 1986)).

[119] <u>Id.</u> (citing <u>United States v. Hughes</u>, 640 F.3d 428, 438 (1st Cir. 2011)).

essential needs."[120] Also included are the suspect's circumstances, such as: "age, education, intelligence, and mental condition,[] as well as his prior experience with the criminal justice system," and the suspect's demeanor.[121] Because the Court has already suppressed essentially all of Monroe's post-polygraph statements, the Court focuses on whether Monroe's Due Process rights were violated during the interview at Monroe's home and during the pre-polygraph interrogation.

    1. Whether Threats Rendered Monroe's Statements Involuntary

Monroe claims that his statements were involuntary because he was subjected to threats and promises.[122] "Law enforcement conduct which renders a confession involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will;" psychological coercion may also make a confession involuntary.[123] Courts must also consider whether law enforcement made "threats of harsher punishment in exchange for a defendant's failure to cooperate." [124]

---

[120] Id. (citing Hughes, 640 F.3d at 438).

[121] Id. (citations omitted).

[122] Def. Mot. 20.

[123] United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).

[124] Jacques, 744 F.3d at 810 (emphasis omitted)(citing United States v. Jackson, 918 F.2d 236, 242 (1st Cir. 1990)).

Monroe claims he was threatened with "harsher than normal legal consequences" unless he made incriminating statements.[125] While there may be statements constituting threats of harsher punishment,[126] these alleged threats occurred during the post-polygraph interview, which the Court has suppressed for the reasons stated above.

The remaining alleged "threats" at issue relate to the inconvenience of executing the search warrant at his home.[127] These statements, however, do not qualify as the type of threats that would render Monroe's statements involuntary, especially given the overall circumstances.[128]

### 2. Whether Promises Rendered Monroe's Statements Involuntary

Monroe also claims that he "received constant reassurances that his cooperation would be noted and conveyed to the prosecutor

---

[125] Def. Mot. 21.

[126] Id.

[127] For example, Detective Houston told Monroe, "[W]e're gonna be here for a long time unless you cooperate as far as giving us the passwords, we're gonna be here for a long time, it's gonna be an inconvenience for your wife and daughter." (Interview at Home Tr. 9.) Detective Houston also told Monroe, "[W]e can search anywhere in your house for that, you don't wanna do that, you got a beautiful home here alright." (Id.)

[128] Compare Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (holding threat to take child from mother was factor in finding confession involuntary), and Tingle, 658 F.3d at 1337, with Jackson, 918 F.2d at 242 (considering defendant and circumstances, threat to harm an adult sibling would be insufficient to make confession involuntary).

and judge so that they may be more lenient in their treatment of him."[129] This argument is unavailing. "It is well settled in the First Circuit that an officer does not impermissibly overbear a defendant's will by promising to bring the defendant's cooperation to the prosecutor's attention or by suggesting that cooperation may lead to more favorable treatment."[130]   Therefore, Monroe's argument that his statements were involuntary because officers made promises in exchange for his cooperation must fail.

3. Whether the Reid Technique Rendered Monroe's Statements Involuntary

Monroe also claims that the use of the Reid Technique rendered his statements involuntary.[131] According to Monroe, he was discouraged "from not admitting guilt by [officers] presenting socially accepted alternatives . . . in order to prod him into choosing the lesser guilt inferring alternative."[132]

The Reid Technique is the most-used interrogation technique by law enforcement in the United States.[133]   John E. Reid & Associates, Inc., the developer of the technique, traces its

---

[129] Def. Mot. 21.

[130] Jacques, 744 F.3d at 809-10 (citing United States v. Baldacchino, 762 F.2d 170, 179 (1st Cir. 1985); United States v. Jackson, 608 F.3d 100, 103 (1st Cir. 2010)).

[131] Def. Mot. 22-23.

[132] Id.

[133] Dan Simon, In Doubt: The Psychology of the Criminal Justice Process 121-22 (2012).

origins to the 1940s.[134] The method consists of a "Behavioral Analysis Interview" and an "Interrogation."[135] The Behavioral Analysis Interview is largely intended "to determin[e] whether the suspect is lying, which is generally indicative of guilt."[136] If, after the Behavioral Analysis Interview, the investigator feels that the suspect is not being truthful, an Interrogation generally follows.[137] During the Interrogation, "the insistence on the suspect's guilt . . . is to be hurled persistently and unwaveringly, and [is to] be accompanied by a flat and assertive rejection of the suspect's denials of guilt."[138] During this process, "the interrogator must make the suspect perceive that confessing is the most beneficial course of action available to him."[139] To achieve this, "the interrogator must distort [the suspect's] perception of the situation, namely by making confessing appear to be more advantageous than refusing to

---

[134]   The Original, John E. Reid & Associates, Inc. (July 5, 2017, 1:46 PM), http://www.reid.com/training_programs/r_training.html.

[135] Douglas Starr, The Interview, The New Yorker, Dec. 9, 2013, at 43; Simon, supra note 133, at 127-34.

[136] Simon, supra note 133, at 127.

[137] Id. at 132; Starr, supra note 135.

[138] Simon, supra note 133, at 134.

[139] Id.

confess."[140] To this end, "the Reid Method advocates the use of interrogative techniques that have been labeled <u>minimization</u> and <u>maximization</u>, which have been deemed permissible by" courts.[141]

Minimization involves

> presenting the suspect with a <u>theme</u> that reduces the import of the crime. Themes usually convey the interrogator's opinion that the crime was not so serious, that the victim deserved his fate, or that anyone else would have acted in the same way. . . . [E]xperiments show that minimizing themes are understood by lay people as implicit promises of leniency.[142]

Maximization, on the other hand, involves

> depicting the case against the suspect as being beyond any doubt. The implicit message is that the suspect is bound to be convicted even absent a confession, and that he faces harsh consequences, especially given the seriousness of the criminal charge . . . and the severity of the corresponding punishment . . . . Cooperating with the interrogators is portrayed as the only possible way to mitigate the direness of [the suspect's] situation.[143]

---

[140] <u>Id.</u>

[141] <u>Id.</u> at 135.

[142] <u>Id.</u>

[143] <u>Id.</u> There is no direct evidence, of course, that the officers here employed the Reid Technique. Special Agent Richardson testified that he had not been trained in the Reid Technique, and Special Agent Braga did not testify. (Hr'g Tr. 31:18-23, June 1, 2017.) Despite the lack of direct evidence, however, the Court concludes that the tactics of Special Agent Braga at the State Police Barracks were clearly based on the Reid Technique as outlined in the sources mentioned above. For example, Special Agent Braga used minimization when he stated that his role was "just to make sure that [Monroe was not] someone who's hurting kids, who's a predator, who's a monster." (Interview at Station 4:93-94.) Special Agent Braga also stated that Monroe's downloading of child pornography was "not the end of the world."

Importantly, the John E. Reid & Associates, Inc. website insists that those conducting the Behavior Analysis Interview who are "specifically trained and experienced in behavior analysis assessment can correctly identify the truthfulness of a person 85% of the time."[144] According to at least one leading scholar in the field, however, this claim is substantiated chiefly by a flawed study.[145] The aspect of the technique intended to decipher truth-teller from liar has been termed "a cacophony of commonly held but poorly diagnostic intuitions."[146] The major problem with all of this is that these interrogation tactics can lead to - or are at least present in - false confessions,[147] and false confessions are

---

(Id. at 4:103-04.) Special Agent Braga further stated that things can be thought of as "a spectrum, with the monster at one side . . . good old American porn [on the other end] . . . [a]nd then right next to that, is like the stuff you're looking at, inappropriate CP, we call it, Child Porn." (Id. at 6:148-152.) Special Agent Braga then used maximization when he told Monroe that he failed the polygraph. (Id. at 117:3476-77.)

[144] Behavioral Analysis Interview, John E. Reid & Associates, Inc. (Aug. 1, 2017, 12:16 PM), http://www.reid.com/services/r_behavior.html; see also Simon, supra note 133, at 122.

[145] Simon, supra note 133, at 131.

[146] Id.

[147] See generally Richard J. Ofshe & Richard A. Leo, Symposium on Coercion: An Interdisciplinary Examination of Coercion, Exploitation, and the Law: II. Coerced Confessions: The Decision to Confess Falsely: Rational Choice and Irrational Action, 74 Denv. U.L. Rev. 979 (1997); see also Simon, supra note 133, at 136-38.

present in up to a quarter of known exonerations of innocent people wrongfully convicted of crimes.[148]

The fact that the Reid Technique is the most widely used interrogation method, and that up to a quarter of exonerations involve false confessions, is no doubt a cause for great concern in our criminal justice system; it is, however, a different question from whether the technique, in and of itself, overbears "the will of the defendant" in the instant case.[149] The First Circuit, in discussing the Reid Technique, plainly notes that deception during questioning is permissible so long as it is not extreme.[150] In that case, the court also noted:

> [T]he agents' statements exaggerating the quality of their evidence, minimizing the gravity of Jacques's offense, and emphasizing the negative media attention that would attend Jacques's trial all fall safely within the realm of the permissible "chicanery" sanctioned by this and other courts. Jacques points to no federal authority supporting a finding of an involuntary confession under similar circumstances.[151]

---

[148] Simon, supra note 133, at 121; see also False Confessions and Admissions, Innocence Project, (July 14, 2017 3:41 PM), https://www.innocenceproject.org/causes/false-confessions-admissions/.

[149] Jacques, 744 F.3d at 809 (quoting Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986)) (internal quotation marks omitted).

[150] Id. at 812.

[151] Id.

While Monroe argues the Reid Technique was used "to discourage [him] from not admitting guilt by presenting socially accepted alternatives . . . in order to prod him into choosing the lesser guilt inferring alternative,"[152] there is nothing impermissible as a matter of law with this interrogation approach; it falls within the range of acceptable interrogation tactics sanctioned by the First Circuit. Monroe offers no authority, and the Court could not find any, for the contention that an agent's minimization of crimes, under these facts, renders a suspect's statements involuntary.[153] Thus, Monroe's argument that the Reid Technique violated his Due Process rights must fail.

The problem with this result, of course, is that it implicitly condones police interrogation tactics, such as lie detector tricks and the minimization and maximization of crimes, which, again, can lead to - or are at least present in - false confessions.[154] Thus, the use of the Reid Technique on most competent adults is lawful until and unless it fails, and proving its failure is a herculean

---

[152] Def. Mot. 22-23.

[153] While this is not that case, it is not difficult to imagine circumstances where, depending on how the Reid Technique is employed or misemployed on a juvenile or an individual with an intellectual disability, the tactics would have an impermissible, coercive effect. See, e.g., In re Elias V., 237 Cal. App. 4th 568, 579-80, 591, 593-600 (2015); cf. Dassey v. Dittmann, 860 F.3d 933, 962-72 (7th Cir. 2017).

[154] See generally Ofshe & Leo, supra note 147; see also Simon, supra note 133, at 136-38.

task to be sure. Generally, it would require overcoming a finding of guilt on a post-conviction claim of actual innocence.[155] The solution to this problem is not to ban the Reid Technique by holding, as Defendant would have it, that its use constitutes a per se Fifth Amendment violation. But, at the same time, law enforcement agents need to consider carefully whether their tactics are appropriate in any given situation, and they should be fully trained, using real science (not company promotional propaganda), on the efficacy and frailties of various interrogation techniques.[156]

---

[155] See generally Innocence Project (Aug. 1, 2017 10:22 AM), https://www.innocenceproject.org/. The problem is compounded by the John E. Reid & Associates, Inc.'s own promotional propaganda that purports to imbue the interview aspect of the technique with nearly magical properties to ferret out lies, leading law enforcement to put unbounded faith in its value. See Behavioral Analysis Interview, John E. Reid & Associates, Inc. (Aug. 5, 2017, 10:37 AM), http://www.reid.com/services/r_behavior.html; see also Simon, supra note 133, at 131 (noting that the claim is not scientifically substantiated and that "[i]t appears that for [law enforcement agencies using the Reid Technique], the lure of the protocol lies with offering law enforcement personnel a pseudoprofessional framework for justifying their preconceptions and thus enabling them to proceed with the interrogation of the suspect at hand.").

[156] See Ofshe & Leo, supra note 147, at 983. For example, studies show that the Behavior Analysis Interview, which is followed by interrogation and distortion tactics if the investigator thinks the suspect is not being truthful, does not actually separate the liars from the truth-tellers. See Simon, supra note 133, at 131. Rather, it simply "validates police investigators' beliefs in erroneous cues of deceit." Id.

Indeed, all agents in the criminal justice system –
prosecutors, defense attorneys, and judges – want a system that
does not wrongfully convict innocent people. If law enforcement
agents are led to believe incorrectly that the Reid Technique
possesses a kind of special power to root out the truth[157] – as the
company's marketing material implies[158] – they will be misled in
certain cases, resulting in false confessions and wrongful
convictions. It is also particularly important to recognize the
risk of false confessions in vulnerable populations.[159]

A change in direction is needed. This is a point advocated by
Professor Simon, in his book, In Doubt.[160] In the book, Professor
Simon reveals the weaknesses of the Reid Technique and suggests
that "[i]nvestigators . . . cease relying on physical cues in
attempting to detect deceit" and recommends a shift from a
"reliance on accusatorial and coercive methods . . . toward less
confrontational procedures that focus on information gathering."[161]
This Court endorses these recommendations and strongly urges law

---

[157] Simon, supra note 133, at 127–32.

[158] Behavioral Analysis Interview, John E. Reid & Associates,
Inc. (July 5, 2017, 1:57 PM),
http://www.reid.com/services/r_behavior.html.

[159] See Simon, supra note 133, at 140.

[160] See generally Simon, supra note 133.

[161] Id. at 143.

enforcement to consider them. After all, in the words of Professor Simon, "[c]riminal punishment should require proof of guilt beyond a reasonable doubt by a system that is seriously committed to the accuracy of its verdicts."[162] Agents of the criminal justice system – law enforcement officers, attorneys, and judges alike – need to recognize fault lines in the system as they become apparent to us and do our best to correct them.

### 4. Whether the Violation of Monroe's <u>Miranda</u> Rights Renders Monroe's Statements Involuntary

Finally, Monroe alleges that, because he was subjected to an "utter refusal to honor his constitutional rights to end questioning and have an attorney appointed," his statements were involuntary.[163] This argument is unavailing. As discussed above, those statements made after Monroe invoked his <u>Miranda</u> rights are suppressed. Short of that, Monroe has not provided any basis on which this violation rendered preceding statements involuntary. Further, Monroe is an adult with no apparent intellectual disability or other diminished capacity. Accordingly, the Court finds the statements Monroe made prior to invoking his <u>Miranda</u> rights to have been voluntarily made.

---

[162] <u>Id.</u> at 216.

[163] Def. Mot. 23.

III. Conclusion

For the reasons discussed above, the Defendant's Motion To Suppress (ECF No. 20) is DENIED in part and GRANTED in part.[164]

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date: September 11, 2017

---

[164] Defendant filed a second Motion To Suppress (see ECF No. 24) while the instant Motion was pending. The Court will address the second Motion To Suppress in a separate order.